Central Mutual Insurance Company v. White Stone Properties Ltd. Mr. Short and then Mr. Bowman. Good morning, Your Honors. May it please the Court. My name is Wes Short and I represent the appellant, White Stone Properties Ltd., which is a commercial landlord based in Austin, Texas. This case is about hail damage to an approximately 200,000 square foot commercial building in Austin that was covered by a replacement cost insurance policy from Central Mutual Insurance Company. Central determined that it was going to cost $1.7 million to do the work on this project, which involved not only the roof but HVAC units, lighting suppression, damage to the interior, damage to the exterior. It was a very large job. That number was exclusive of overhead and profit, meaning that it did not include any overhead and profit for the contractor who was going to do the work. At the same time, White Stone got six bids to do the job and accepted the lowest bid, which was $2.45 million from a company called Inateck Construction, which is a company that was run by the same people that White Stone Properties worked with to maintain their buildings. They signed a contract with that company, and it was for insurance proceeds, and the insurance proceeds referred to an attached exhibit which listed out what those insurance proceeds were, and it was $2.45 million. The way that was calculated was that they took the insurance estimate of $1.7 million, added overhead and profit and sales tax to that to get to the $2.4 million number. Those were the two differences in the two numbers. That number would double sales tax by accident. Is that true or not? There were sales tax added into that number, and it was not established at trial as to whether that was the same sales tax that was part of the original $1.7 million estimate. So there was sales tax in both estimates, and at this point it remains undetermined is that the exact same number. That number, that $2.4 million was not approved, by the way, by the insurance company at the time. At trial, it was established that this number, this $2.4 million number, had come actually from Central Mutual's adjuster, who had told the contractor that it would approve that number after an appraisal, but unfortunately the appraisal process never occurred, and so that $2.4 million number was actually never approved by the insurance company. Now, fortunately for Whitestone, it built a contingency into the contract. In Section 9E of the contract, it specified that this additional amount that was in the $2.4 million number, this overhead and profit, was only due once the appraisal was concluded, and since the appraisal was not concluded, Whitestone did not owe that money to the contractor. The contractor was simply stuck with the original insurance estimate. Now, the contractor did draws on this project. There were 11 of those. They were included in Edwin's Defense Exhibit 13. Those 11 draws stated on the face of them that the contract price was $2.45 million, and every single one of them, they were signed by the contractor and initialed by Whitestone Properties. The reason I bring this up is because the Texas Supreme Court has held numerous times that when you're talking about the same transaction and numerous documents pertaining to the same transaction, those documents are considered one part of the same contract. And so to the extent that there's any confusion about the term insurance proceeds in the primary contract, you can just look to the draws and see that in every single one of those, they agreed that the insurance proceeds number referred to $2.45 million because the contract price was specifically stated in each one of those as $2.45 million. Now, the parties performed this contract. The contractor did everything he was supposed to do under the contract. It was finished. It was finished properly. There's no question about the work. Whitestone Properties also did all of the work that they were supposed to do under the contract. There's only one thing that Whitestone Properties didn't do under the contract, and that was to pay the withheld depreciation. There was $482,000 of depreciation withheld by the insurance company until the work was complete. Now, whether the insurance company has to pay that turns upon the limits of liability in the policy. There's three of them. The first one is the policy limits itself. That's not at issue today. The second one is limitation number two. It's called the cost to replace. That was the basis upon which the insurance company denied coverage, the way they denied payment of the $482,000. They believed that the cost to replace was less than their estimate. They tried that issue, and they lost that issue. The trial court found that the cost to replace was, in fact, their estimate, which is what the law is. The limitation number three we didn't try. That's called the amount actually spent. That's the amount spent by the insured to do the work or the amount the insured agrees to pay someone to do the work. That issue was not tried, but that's the issue that we're here on about today. And I have three points about that limitation number three. The first point is the trial judge misinterpreted the contract as a matter of law. This limitation number three is the amount spent by the insured or the amount that the insured agrees to pay to do the work. It's not the amount spent by the general contractor. And that's what the trial court found, that it was the amount spent by the general contractor. There's not a single case in the United States that's misinterpreted. But isn't the exact language actual spent? And then, of course, the word necessary seems to have some meaning. It is. The actual language is the amount spent, which begs the question spent by whom. And there's not a – the cases that have interpreted this have all said it's the amount spent by the insured, not by the contractor. And that's the only thing that makes sense because if it was the amount spent by the contractor and the insurance company could limit their liability to the cost of the contractor, then you'd never be able to hire a contractor. But I thought the district court built in to the amount spent by the contractor overhead and profit. So it was the $800,000 plus 20%. The trial judge, what he did is he found that the amounts that the contractor paid to one of its subcontractors for part of the job was the amount spent. And then they added – he added an arbitrary 20% into that. Right. That's not the amount spent by the insured, though. Actually, it was undisputed that to date the insured had spent $1.44 million paying this contractor. So there's a disconnect here, and not a single case has ever held that this is the amount spent by the insured's contractor. Does the insurance company have to approve the amount of some part of it? Can the insured just go out and hire whoever they want and pay top dollar without the insurance company having a say as to how much is spent to put up the new roof? That's an excellent question. The way an insurance company protects itself under this policy is because their limit of liability is the lower of these two numbers. The insured does its homework – I'm sorry, the insurer does its homework up front. They hire an engineering firm. They hired an independent adjusting firm. They hired a contractor, and they did their homework to figure out how much is this going to cost, and that's the $1.7 million number. And they limit their liability to that. So if the insured goes out and hires a contractor and agrees to pay that contractor $2.45 million, and the insurance company hasn't agreed to that and hasn't reappraised the number and made it higher, then their liability is limited to that $1.7 million number. But that seems to collapse the measures all down to measure two. It seems to read out of existence three. Section three, where you're looking at actual amounts spent, and then with the added proviso if necessary, can't bind the insurer to whatever contract price that is negotiated between the insured and the contractor without an ability to inquire as to whether the amounts spent were necessary. Well, that's partially correct. If it is more than the amount that they've appraised, they limit their liability to the amount that's appraised. But that's an upfront assessment, right, to get cash quickly, which I'm assuming your client's grateful that they did. So it doesn't, you know, and when you say that the universe of cases supports your view, the cases that I thought you cited, prominently Northrop and Pierce, those involve contracts that were determined to be valid. But it seemed to me the whole bench trial led Judge Sparks to say, I've heard from all parties, including Ms. Laurent, and the inflated amounts don't exist. They're bogus. They're not legitimate. He did find that. And that's actually incorrect finding as a matter of law because a sham contract, as we know, is a contract that neither party intends to perform. And in this case, both parties actually performed it. And the only reason it wasn't fully performed was because of the insurance company. They failed to pay that withheld depreciation. But to your point, you're correct that the insurance company is not bound by the insured's contract with its contractor. So if the insured agrees to pay $10 million to the contractor, the insurance company's liability is only limited to its estimate up front. Now, the other way it works, the other way they protect themselves, is if the insured goes out and they find someone to do it for less. Then that savings is passed on to the insurance company. If they hire someone, for example, that says, I can do this job for $1.5 million. When I mention those two prominent cases, Pierce and Northrop, do you have a case where the validity of the underlying contract was in dispute or was found not to be supported? Actually, in both of those cases, that was in dispute as to whether or not it was. But I thought the courts determined that those were valid contracts, whereas in this case the district court made the finding that it wasn't valid. Is your position he can't even look into it? Or is your position that he was clearly wrong factually to find that it wasn't? He was clearly wrong. The conclusion of law is wrong because it's impossible as a matter of law for a contract that the parties performed to be a sham. But to your point, if it were a sham, if it turns out that that contract didn't exist, then the court would have to decide what is the agreement between the parties. Because clearly there was an agreement. So if the court is going to set aside this agreement and says that's not it, this isn't what you guys agreed to, then what did they agree to? The court didn't do that. The court simply picked one expense, one of the subcontractors hired by the general contractor for part of the job and said that is the cost to the insured.  What's the mischief caused by a rule that says actual amount spent that's necessary is hindsight assessment of what was spent and necessary with overhead? Is that inconsistent with some case? Or is that just inconsistent with the language of this contract? This contract just says the cost, the amount actually spent. It doesn't say by the insured. Well, but you keep leaving out the word necessary. That's true. Okay, so maybe it's not directly inconsistent with the language of the contract. But when I make that proposition to you, what case do you think disallows us from coming to that conclusion? That the court can look into the contract itself. Well, that Judge Sparks can do exactly what he did here. Well, he can't do what he did here because for two reasons. One, he was wrong that it was a sham. But even if it was. Actually. Well, and legally. Okay, what case establishes that he was wrong legally? I believe we cited a case in the brief that a sham contract is one where neither party attends to perform. And in this case, both parties did perform. And so when you apply the law to the facts here, it's simply wrong as a matter of law. But taking your point, let's assume that for the sake of argument it was a sham. Then you still have to decide what did the insured spend. The necessary expenses of the insured, not the necessary expenses of the contractor. And that was impossible to determine. The court decided we can't figure this out. Nor do we know how much any of the contractors that bid this job would have made or spent. And it's simply an impossible exercise, frankly. That's not the way that the insured's company protects itself by waiting until the job is over and then going and auditing the contractor to try to figure out how much this is. You said several times that it couldn't.  I'm sorry, go ahead. That it couldn't be a sham contract because the parties tried to perform it or something like that. Because they did perform it. Well, what's your authority with that? Are you saying it can't be partially sham or it can't be puffed up? Well, the standard for whether something's a sham is that the parties don't intend to perform. If they don't perform it on the back side, then that's a breach. But whether it's a sham, you have to not intend to perform it from the beginning. In this case, they not only intended to perform it, they did perform it. And the only thing left. What if it's sort of a sweetheart contract where it really shouldn't cost that much, but the parties agreed to it and there's a kickback or something like that? If that were the case, then the insurance company wouldn't be bound to buy it because it would be more than the insurance company's own estimate of the job. And the insurance company's limited to the lower number. So the insurance company protects itself in that instance. The insurance company's not bound by that contract. Now, and again, in this case, though, I think it's important to remember that under Section 9E of the contract, because those additional amounts in the contract with this contractor were not approved by the insurance company and didn't go through appraisal, Whitestone didn't have to pay those amounts. So ultimately, Whitestone was not obligated to pay the $2.4 million. It was obligated to pay the lesser number. And so I don't think Judge Sparks even considered that in his ruling. And he just disregarded the contract as a whole without considering the fact that the parties had actually performed under it and without substituting a new one. He made no attempt to find what is the agreement between the parties. And, again, it's not our burden. It's actually the insurance company's burden here. And Judge Sparks shifted the burden to us. He said in his findings that we failed to establish how much the insured's general contractor had spent on the job. So it was the wrong standard, and it was the wrong burden of proof, because it's not our burden to establish the limitations of liability of the insurance company. Third point, the trial court should have granted us summary judgment because the parties agreed up front that this was – there were no material facts in dispute in the case. All the court had to do was determine two numbers, the amount of the estimate that it had made and the amount that the insured had agreed to pay the contractor, which was not in dispute at the beginning. In fact, they agreed with us. Yes, it was $2.45 million. That was not in dispute. In fact, in the case, they told Judge Sparks several times, this is an irrelevant number. The court need not concern itself with calculating this limitation number three. They didn't rely upon it. We didn't even try the issue. This is a new thing that came up in Judge Sparks' findings. But what the judge did instead was try to figure out how much did the general contractor spend on the job, which, again, is the wrong standard. Not a single case has ever held that the limitation of the liability in the insurance company is the amount actually spent by the insured's contractor. I'm out of time. Thank you, sir. Mr. Bowman. Thank you, Your Honor. I thought it was rather interesting, Your Honors, when I was listening to opposing counsel describe the facts of this case. One of the things I didn't hear is who actually did this roofing work and what it cost. The record is pretty clear that what Whitestone did in this case was they took their roof, which was a modified bitumen roof, and replaced it with a TPO roof, which work was done by CEI Roofing. And both the summary judgment evidence and the trial evidence was quite clear that the amount that CEI charged to do that work was $816,852. And the evidence was also clear that that was a complete turnkey job. CEI Roofing provided all labor, all materials, all insurance, all payment bonds, performance bonds, all supervision, was responsible for all safety assigned to the job. They did everything. And the reason we're here is when the insurance company – I'll kind of go back a little. When the insurance company gets a loss like this, with the way the replacement cost coverage works, the insurer doesn't have any obligation to replace his property. He doesn't have to if he doesn't want to. But what he gets is the actual cash value loss to his property. And I haven't had several hail losses to the roof of my house. I'm kind of familiar with how it works. And basically, say like the last time I had mine, Your Honors, I had a five-year-old comp shingle roof. So I got paid what a five-year-old comp shingle roof is worth. The insurance company withheld the depreciation. That gives me my seed money to start replacing the roof should I choose to. And then I'm free to go replace it. If I want to go back with a more expensive roof, I can, but I'm not going to get the cost to install a new, say, slate roof when I had a comp shingle roof. What Whitestone did here, which they're entitled to, they went back with a TPO roof, and as the record in the case reflects, it's actually a lot better roof than what they had. It doesn't require near the amount of maintenance. It's more energy efficient. It's just a better roof all the way around. It just costs substantially less to install than what a modified bitumen roof does. As a matter of fact, basically the ACV payment that Central made for the roof was, and this is in the record, but it's right at $1,238,000. And so you take the $816,000 that it cost to install that roof, their actual cost to replace the roof was about $420,000 less than the ACV payment. And as some of the cases I've cited in my brief show, the Estes case, the Lincoln Properties case and others, when you're able to replace the damaged property for less than the actual cash value payment, you don't have anything you can recover. Did the 1.7 actual cash value amount include overhead? Yes, Your Honor. And what it was, it wasn't an estimate. The insurance company, and this is in the record, paid based on the bid submitted by Lawn Smith Roofing. I don't know if you're familiar with them, Judge, but they're a statewide roofing company in Texas, big company, do stuff all over. They submitted a bid because they wanted the job. And as Judge Sparks noted at trial, he sure Lawn Smith Roofing isn't in the business of installing roofs for free. So they had that built in with their prices. It wasn't a separate line item, but it was built in in their unit cost. So that was definitely included. But let's just say for the sake of argument, Your Honor, that it wasn't. If you still take, and Judge Sparks did this, and that's why he did, well, first, when he made the factual findings concerning the Initech contract about how, I've made notes in here, it was baseless, irrational, bogus, specious, and a sham. And all those were factual findings based on the evidence. And all of that evidence that supported that, that's all set out in my brief, including the pages and references in the record that support every one of those factual findings by Judge Sparks, which under the clear, under the clear- You're saying, is your point that you're getting to that whatever figures we pump into Measure 2, Measure 3 is still going to be less?  I was trying to get there, Your Honor. Exactly. And that's why when Judge Sparks, in his ruling, factored in, hey, even if you wanted to say that Initech had to do something necessary as a general contractor, it was established through Ms. Laurent's testimony that the standard fee and the customary fee and what she was charged for that was 10% overhead, 10% profit. You add 10% overhead and 10% profit to what CEI did, and you're still not even at a million dollars. And you add in the sales tax, which was right about $105,000, you're still less than what the ACV payment is. So, again, all of that supports the factual findings Judge Sparks made that the amount that was necessary- Hypothetically, under this type of provision, which I assume is common, what would happen if they had done an appraisal and showed it to your client, and your client had said, looks good. Would you still then be able to later go to trial and say, well, you actually didn't need to spend as much as you did? That would seem to be more like the Northrop Pierce cases, where you're not allowed to attack a contract you've already said is accurate, or am I mixing it up? We may be talking apples and oranges, Your Honor. When you mention appraisal, in the insurance contract, it's got a specific definition, since there's a specific provision for appraisal. And what that is in the contract, it's where the parties disagree on the amount of loss. Then either one could demand appraisal, and basically what happens, each side selects an appraiser, and then the two appraisers agree on an umpire. If they can't, one gets appointed by the court, and then those three issues. And what happened here in that regard? Appraisal never took place. Now, it was demanded, but it just never came to fruition, because once the issue came up with the CEI contract and once that was discovered, the issue at that point wasn't the amount of loss, because we knew what it cost to replace the roof. It was the $816,825. It's just a matter now, at that point, legally-wise, is there any other amount they're entitled to recover, since the amount it took them to replace the roof was far less than the ACV payment? So it basically made the appraisal moot. So the fact that you didn't have an appraiser is the reason all this took place? Had there been an appraisal, would this have not occurred? That would depend, obviously, from some uncertain facts we don't know. But say appraisal had taken place, Your Honor, and it sets a replacement cost loss and an actual cash value loss. Then you'd be at, again, the same point where you're at, and that is the appraisal would set the ACV loss that the insurance company would owe up front. Then they would wait for the repair documentation to see if the insured incurred cost in excess of the ACV payment so that they would be entitled to some additional sum under the RCV coverage. So, yes, possibly could we still have been at this point? Yes. It would just depend on what the appraisal award rendered as far as a replacement cost value loss and actual cash value loss, if that makes sense. So if the insurance company at all points entitled to disagree or contest with their bills, they come with their bills and say this is what it cost us, the insurance company is entitled to go behind those bills and see if they're accurate or, in fact, those costs did take place? Yes, Your Honor, and the big reason and where that's in there is it's that cost that are necessary component. You know, that allows the insurance company to be able to look at what's submitted to see if, you know, A, they were incurred, B, they're reasonable, and C, they're necessary. I mean, if that wasn't in there, the insured could just submit anything and say, here it is, you have to pay it, and it could be completely bogus. And it just, as our Texas law is clear, you can't interpret a contract, an insurance contract, in a way that would lead to an absurd interpretation, which is what that would do, which is why the insurance company has in the conditions that the insured has to produce pertinent documents and records and, like in this case, it would be costs related to the repairs and replacement so that they could be examined if necessary. The policy also allows the insured to go out and inspect the property after repairs so that they can see that, A, they've been made, done properly, basically to see that what the insured is claiming in replacement costs has been done, is reasonable, is legit, and is owed. So it just gives them a chance to determine that the amount is owed so that they can make their depreciation hold back payment of whatever may be owed and close the claim. If you follow counsel's argument, an insurance company would never be able to do that and they would just have to pay whatever an insured submits. And this case illustrates how absurd that would be. They got, the insured got a brand new roof, which that's what replacement cost is for. No argument here. Better than the old roof. Yes. But even if they had gone back with the same kind of roof, Your Honor, they've still got a brand new modified bitumen roof that's going to have a 20-year useful life, which they didn't have before, but, you know, you pay an extra premium for replacement costs, so that's part of the bargain you contracted for. But like in this case, if the insured replaces his roof and he does it for less than his actual cash value payment, again, that's proper because the actual cash value payment represented the loss to that property he had at the time. But you don't get a new roof, and when you spend less than the ACV payment, also get some depreciation holdback on top of it. You know, you basically don't get a new roof plus even more money to put in your pocket, which goes, Texas case law is countless that property insurance is just a matter of indemnity, and you don't get to profit from having a property loss, which is exactly what Whitestone is trying to do in this case. I mean, they already fared pretty well by getting a better roof, having about, I'd say, $250,000, $275,000 of ACV money in their pocket, and now they're basically asking the court to let them have another half a million dollars in their pocket based on the cost of replacing a type of roof that they never installed. That's what this case boils down to in a nutshell. They're saying the insurance company owes for the cost it estimated to replace the modified bitumen roof with another modified bitumen roof, and the big flaw in that argument is the insured never went back with another modified bitumen roof. And so, you know, as I pointed out in our brief, once you have the actual replacement made, that's what you look at. It's the Steers case. Another one was the Robertson case decided by the Fifth Circuit that I've also got in the brief. But as those cases show, that initial estimate is simply to get the ACV loss determined, get the seed money in the insured's hands so he can start making repairs. But once the actual repairs or replacement is made, you look at what actually was done and then compare that to what you've already paid to see what additional amount may be owed. And say in this case, say the TPO roof had cost $100,000 beyond what the ACV payment was. The insurance company would owe that additional $100,000. In this case, it was just sizably less than the actual cash value payment the insurance company made so that nothing further would be owed. He added overhead and profits, correct? Yes. But that was based on the contractor's figure? Yes. So then, I mean, if you acknowledge the general contractor, it deservedly is a role, a contributing role, even if the facts of this case show perhaps illegitimate or insider, whatever it is that he found. Where's the money for a general contractor? How's that built into the amount that was? That was built into the Lawn Smith estimate, even though it's not a— And Judge Sparks used the Lawn Smith evidence for Measure 3? No, for Measure—actually, I think what Judge Sparks did is he just determined that even under that amount actually incurred argument, the only thing that was necessary was what CEI did. But he goes, if you wanted to carry it further, just paraphrasing what he said in his opinion, but, you know, if you also wanted to factor in the 10% overhead and 10% profit that Innotech stated it was entitled to as a general contractor, you factor that in, and the 10% overhead and 10% profit was 10 and 10 of what the subs, all the subs did on the job. The only sub here was CEI. So you factor that in, and as he noted, you're still substantially under the actual cash value payment. So this isn't a situation like I have in some of my cases, Your Honor, where we've got a big dispute about whether a general contractor is necessary. Here, that's kind of a moot point, because if you just wanted to assume one was necessary, despite the overwhelming evidence— You think he did? I'm sorry? He made that cushioning assumption? Yes. What about their argument that you've waived reliance on Measure 3? As I cited in our brief, Your Honor, what he's pointing to, I made various alternative arguments in our summary judgment motions, you know, and you can see them there, but along the lines of even if you wanted to assume that this contract with Innotech was legitimate and assume they did something that was necessary, the cost to install a comparable roof was what CEI roofing charged, and so that's less than this Innotech contract. So like I put in my summary judgment motion, you know, we still win because that's the lesser amount. That would be the amount that would determine what's owed. There was never—and you can look at all the pleadings, Your Honor— there was never any admission that we're saying the $2.4 million constitutes Measure 3, and that's it. I did what any lawyer does when you're facing summary judgment or making those, Your Honor, and that's make this argument the alternative just to try to show there's no dispute of material fact that would preclude me from prevailing as a matter of law. And as far as when you bring that up, Your Honor, when counsel mentioned about Judge Sparks erred in denying the summary judgment motion, that clearly is not the case because, as I pointed out in my response to their summary judgment motions, I went through all kinds of evidence that showed that the Innotech contract was not legitimate, at the very least creating a fact issue there, and then also presented all the evidence from CEI roofing showing what it actually took to replace the roof, and again, at the very least, that creates issues of material fact so that Judge Sparks, I think, was entirely correct in denying both motions, having a bench trial, hearing evidence, sizing up the credibility of witnesses and making his determinations on honesty and credibility just like any jury and making the factual findings he did, all of which factual findings would not— were more than amply supported by the evidence. So under the clear error standard, there'd be no basis to overturn those, and those factual findings clearly show that Central was entitled to prevail and Judge Sparks reached the correct result. And the key thing on that is Judge Sparks found that there was nothing Innotech did that was necessary to replacing the damaged roof, and that clearly is a factual finding supported by the evidence which has to be affirmed on appeal, and when you affirm that, you get to where the only possible measure is what CEI charged, and the evidence is undisputed that that is substantially less than Central's ACV payment, and so under that scenario, we win as Judge Sparks correctly ruled on. Now, another thing I thought was kind of interesting in counsel's argument is that when he was asked about— and it was you, Judge Dennis—asking him about a sweetheart contract and a kickback and, you know, how's the insurance company protected there, counsel mentions that the insurance company's protected because their liability is limited to the lower number. Well, you know, I do agree that the insurance company's protected that way, and that lower number here is clearly the CEI contract, especially considering that the evidence was undisputed that they did everything necessary to replace the roof, and just using counsel's own argument there, it shows my clients properly had judgment ruled in their favor because here the lesser amount is what CEI roofing charged. There's no dispute that the amount CEI roofing charged is over $200,000 and less than the actual cash value payment. There's no dispute that if you add the 10% overhead and 10% profit to what CEI roofing charged and even sales tax, you're still under the actual cash value payment Central made. And in addition to that, I had pointed out other items in the brief showing all the other items that Central had overpaid on, and basically it's the old saying, no good deed goes unturned. I think my client overpaid Whitestone by about $450,000 and just ain't enough. They want another half a mil, which they're clearly not entitled to, and Judge Sparks correctly saw that, correctly ruled in our favor, and that judgment should be affirmed on appeal. Thank you, sir. Thank you. Back to you. Thank you, Your Honor. Let me correct a few misstatements here. First of all, there's no evidence that this roof actually cost less than the original roof. That's simply false. The only evidence at trial was that they cost approximately the same. So I agree that there was a benefit to the insured by getting a roof that was newer technology, but they didn't spend any less to get it. And the contractor testified that they cost about the same. Another misstatement, the $1.7 million estimate from the insurance company, that definitely did not include overhead and profit. That's in our motion for summary judgment. The corporate rep for Central Mutual testified in his deposition that, no, it did not include overhead and profit. That's just simply wrong. There was also another misstatement. There's no money in Whitestone's pocket. That's simply false as well. The evidence at trial was that every single dollar that was received from Central Mutual was paid to the contractor in accordance with the terms of the contract. Not a single dollar was retained by Whitestone. So to say that Whitestone's putting money in its pocket or trying to put more money in its pocket is simply false. And let me also point out that this issue about CEI roofing, this is a subcontractor, one of the subcontractors hired by the general contractor. We don't know who those subcontractors are. They didn't establish who all the other subcontractors were. They didn't establish all the work that was done. At the end of the trial, the court still didn't know what all the expenses were and all the work done by the general contractor. And so we had no relationship with the CEI roofing company. And I also want to point out that this term, necessary, we're talking about necessary expenses. We're not talking about necessary work but necessary expenses. The court did not find that the amount that was paid to the contractor was not necessary or that there was an agreement that was not necessary. Again, we have an agreement here. The cases say clearly that when an insured signs an executory contract to do the work, that executory contract is the amount actually spent by the contractor. I'm sorry, by the insured, and that's the case here. Let me also point out about the motion for summary judgment. The only, again, the parties agreed that there were no material facts in dispute at the time of the motion for summary judgment, both parties. And Central Mutual, as pointed out in our motion for summary judgment, had actually agreed with us that this Measure 3 was the $2.45 million contract. And that's why they told the court, for example, in their proposed findings of fact and conclusions of law, in their brief to the court that this Measure 3 was irrelevant, that the court need not even consider it. They had already conceded the issue that it was the $2.45 million contract. They had denied coverage based upon limitation number 2, not limitation number 3. And so the evidence was not put on at trial. Nobody argued the issue at trial. Nobody put on evidence on trial on limitation number 3. We didn't even discuss it because it was not one of the things that the insurance company indicated it was relying upon in denying coverage. And so, frankly, the trial court blindsided us with this ruling on the issue, particularly since they have the burden of proof on establishing it. Where are we today? Does your client then owe the general contractor the money that they charged? My client does, and that contract is still a valid contract and still owed. It is true, however, that because the appraisal didn't go through, my client does not owe the contractor the full $2.4 million. That contingency, the overhead and profit contingency that was built into that number, comes out under Section 9e of the contract. So essentially the two numbers merged. The amount that the insurance company had agreed to pay is approximately the same as the insurer had agreed to pay the contractor. And, again, I think Judge Sparks was disturbed by this number, this $2.4 million number. Where did this come from? Again, nobody put any evidence on about that because limitation number 3 was not an issue at trial. It was not the thing that the insurance company indicated it was relying upon in denying coverage, and they had already conceded the issue. They're flip-flopping now and saying that, really, actually limitation number 3 is an issue. What's your best record site for the affirmative concession of measure 3? Our motion for summary judgment attaches – it mentions it in our motion for summary judgment, and it attaches the actual deposition of the corporate representative, the entire deposition, in which he concedes, yes, limitation number 3 is the $2.45 million, and he says if it was fully performed. And then I asked him, is there anything that wasn't fully performed, and he said no. This is Cagle? This is Steve Cagle, both the adjuster and the corporate representative. So, in conclusion, Your Honor, we're asking for two things. Reverse Judge Sparks' ruling on limitation number 3 or reverse his denial of the motion for summary judgment. Render judgment for the $482,000 and withheld depreciation and remand on the issue of attorney's fees since attorney's fees are handled in the Western District by submission and we didn't have the opportunity to submit them. Thank you, Your Honor. Thank you, sir.